IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: § | | |
| § | | |
| **DEEP MARINE HOLDINGS, INC.,** § | Case No. 09-39313 |
| et al. § | |
| § | Jointly Administered |
| Debtors. § | Chapter 11 |

**EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING FINAL HEARING**

The above-captioned debtors and debtors-in-possession (together, the "Debtors"), by and through their undersigned proposed attorneys, hereby file this motion (the "Motion") for an order, pursuant to Bankruptcy Code §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014, and for entry of an order authorizing the Debtors to, among other things, (a) obtain post-petition financing of up to $3.1 million in principal (plus a Commitment Fee (defined below) and certain costs) and (b) grant adequate protection in the form of security interests and superpriority claims in connection therewith. In support thereof, the Debtors would show as follows:

**I. JURISDICTION**

1. This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the

relief requested herein are Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014

## II.  RELEVANT BACKGROUND

**Business Description**

2. On December 4, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors-in-possession.  Joint administration of the cases was granted by Court order on December 8, 2009.  No trustees or examiners have been appointed in these cases.

3. With their original petitions, the Debtors contemporaneously filed a Notice of Designation as Complex Chapter 11 Bankruptcy Case.

4. The Debtors are privately-held companies based in Houston, Texas that provide subsea services for the offshore oil and gas industry.  The Debtors offer remote operated vehicles, subsea construction and field development works, deepwater intervention tasks and inspection and repair services.

5. The debtor Deep Marine 1, LLC is a Louisiana limited liability company wholly owned by the debtor Deep Marine Technology Incorporated.  Deep Marine 1, LLC is the owner of the DMT Diamond, a 240 ft. Class II DP Maintenance and Support Vessel, which includes a 50T dynamic knuckle boom crane, a Subsea Launch & Recovery Winch with 10,000 ft. of 1 1/2" cable, and accommodations for 36 people.

6. The debtor Deep Marine 2, LLC is a Delaware limited liability company wholly owned by the debtor Deep Marine Technology Incorporated.  Deep Marine 2, LLC is the owner

of the DMT Emerald, a 292 ft. Class II DP Maintenance and Support Vessel, which includes a 100T knuckle boom crane, a 100T Heave Compensated Multi-purpose Lifting Tower, a 23x27 Moonpool, and accommodations for 73 people. The DMT Emerald is outfitted with two 150 Hp, 10,000 ft. Triton XLS work class remote operated vehicle ("ROV").

7. The debtor Deep Marine 3, LLC is a Delaware limited liability company wholly owned by the debtor Deep Marine Technology Incorporated. Deep Marine 3, LLC is the owner of the DMT Topaz. The DMT Topaz is a 220 ft. Class II DP diving support vessel, which includes a 40T knuckle boom crane. The DMT Topaz is outfitted with a 150 Hp, 10,000 ft. Triton XLS work class ROV.

8. The debtor Deep Marine 4, LLC is a Delaware limited liability company wholly owned by the debtor Deep Marine Technology Incorporated. Deep Marine 4, LLC is the owner of the DMT Sapphire, a 240 ft. Class II DP Maintenance and Support Vessel, which includes a 40T knuckle boom crane, a Subsea Launch & Recovery Winch with 10,000 ft. of 1 1/2" cable, and accommodations for 36 people. The DMT Sapphire is outfitted with a 150 Hp, 10,000 ft. Triton XLS work class ROV.

9. The debtor Deep Marine Technology Incorporated is a Texas corporation, and is the sole member and manager of Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and Deep Marine 4, LLC. Deep Marine Technology Incorporated is the wholly owned subsidiary of the debtor Deep Marine Holdings, Inc., a Delaware corporation. Deep Marine Holdings, Inc. is owned by DCC Ventures, LLC and Otto Candies, LLC.

10. As of the Petition Date, the Debtors employed seven (7) individuals in total, all of whom were and are employed by Deep Marine Technologies Incorporated. Four of these

individuals are currently aboard the Debtors' various vessels. The remaining three individuals consist of the Chief Operating Officer, Chief Financial Officer and Controller.

11. The Debtors' businesses heavily depend on the availability of capital. The downturn in the economy, the credit crisis, and the dramatic drop in oil and gas prices have all negatively impacted the Debtors' businesses and the Debtors' abilities to timely meet their financial obligations.

**Key Credit Facilities**

12. As of the Petition Date, certain of Debtors were parties to the following credit facilities and accompanying loan documents, among others:[1]

(a) The Credit and Security Agreement dated as of July 2, 2007, by and among Deep Marine Technology Incorporated, as Borrower, Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and Deep Marine 4, LLC, as Guarantors, National City Business Credit, Inc. as Lender[2] and Agent, National City Bank, as Issuer, such other Lenders as may be a party thereto from time to time (as amended and restated from time to time, the "DMT Revolver"). The DMT Revolver is allegedly secured by liens on certain property of Deep Marine Technology Incorporated.

(b) The Loan Agreement dated as of November 30, 2006, by and among Deep Marine 1, LLC, as Borrower, and National City Commercial Capital Corporation, as Lender (as amended and restated from time to time, the "DM1 Loan Agreement."). The DM1 Loan Agreement is allegedly secured by a lien on the DMT Diamond.

(c) The Loan and Security Agreement dated as of June 7, 2007, by and among Deep Marine 2, LLC, as Borrower, Deep Marine Technologies Incorporated, as Guarantor, the Lenders party thereto from time to time, and Merrill Lynch Capital, as Administrative Agent (as amended and restated from time to time, the "DM2 Loan Agreement."). The DM2 Loan Agreement is allegedly secured by a lien on the DMT Emerald.

(d) The Second Amended and Restated Term Loan Agreement, dated as of September 9, 2009, by and among Deep Marine 3, LLC, as Borrower, and DCC Ventures, LLC

---

[1] The list of credit facilities provided in this Motion is not being proffered as a full and complete list of credit facilities and related documents to which the Debtors may be parties. Proposed counsel for the Debtors is continuing to undertake a thorough review of all credit facilities and related documents to which any of the Debtors may be a party. Furthermore, nothing in this Motion is an admission, or should be deemed to be an admission, of any liability of any Debtor under any particular credit facility, or the extent, validity, or priority of any lien, guaranty or other alleged interest in property of the Debtors.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the relevant loan documents.

and Otto Candies, L.L.C. as Lenders (as amended and restated from time to time, the "<u>DMT 3 Loan Agreement</u>").  The DM3 Loan Agreement is allegedly secured by a lien on the DMT Topaz.

(e)    Certain other credit facilities that allegedly encumber the Debtors' various Roves and accounts receivable.

13.   There may be other credit facilities to which one or more of the Debtors are parties.  However, **there is no credit facility or related loan documents (i.e. guarantees or mortgages) encumbering the DMT Sapphire.**  A search of the lien records of the U.S. Coast Guard's National Vessel Documentation Center performed on December 14, 2009, evidenced a "Notice of Claim of Lien" filed against the DMT Sapphire by the following:[3]

(a)    Crossmar, Inc. in the alleged amount of $370,927.81;

(b)    NREC Power Systems, Inc. in the alleged amount of $564,550.78; and

(c)    BNA Marine Services, LLC in the alleged amount of $238,796.46.

14.   Additionally, the nature of maritime liens is such that recordation is not always required.  Thus, there is the possibility that additional unrecorded maritime liens on the DMT Sapphire may exist.

**Material Terms of the Proposed Post-Petition Financing**

15.   The Debtors presently lack sufficient liquidity to support their operations.  The Debtors have thus concluded that they will require new post-petition financing to meet their ongoing working capital and general business needs while they continue the process of finalizing and seeking confirmation of a plan of reorganization.  Subsequent to the Petition Date, the Debtors received inquiries from several lenders with initial interest in funding post-petition financing.  The Debtors also contacted certain existing pre-petition secured lenders.  The Debtors eventually entered into substantive discussions with SunChase Holdings, Inc. ("<u>SunChase</u>"), and

---

[3] The Debtors do not admit to the extent, validity or priority of any maritime liens, whether recorded or unrecorded, on the DMT Sapphire or any other vessel, and reserve all rights with respect thereto.

the Debtors, in consultation with their legal and financial advisors, have negotiated and entered into, subject to Court approval, a Debtor in Possession Loan Term Sheet (the "Term Sheet"), which is attached hereto as **Exhibit A**, and which is intended to outline the material terms of a debtor-in-possession loan (the "DIP Loan").[4]

16. Bankruptcy Rule 4001 requires that motions requesting authority to incur post-petition financing begin with a concise statement of the relief requested, that summarizes the material terms and sets forth where the material terms can be found in the documents. Such summary is set forth below.[5] The Debtors believe that these terms will reasonably address their near-term financing requirements and constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Chapter 11 cases.

(a) **The DIP Loan Parties and Other General Terms.** Extensions of credit under the DIP Loan will be made by SunChase Holdings, Inc. or an entity specifically created by SunChase Holdings, Inc. of that purpose, as lender (the "Lender"), to each of the Debtors, as borrowers. (Term Sheet p. 1).

(b) **Total Facility.** The DIP Loan shall be in the total amount of $3,100,000.00 plus Lender's costs and expenses, including attorneys' fees, and the amount of the Commitment Fee (as defined below). The amount of $1,500,000 (plus the amount of the Commitment Fee) shall be available upon (i) the Lenders review and approval of the information contained in Exhibits A, B, C and D to the Term Sheet, (ii) entry of an interim order by this Court approving the DIP Loan, which is satisfactory to the Lender, and (iii) recordation of a preferred ship mortgage related to the DMT Sapphire with the Coast Guard Vessel Documentation service. The remaining $1,600,000 shall be available upon (A) entry of a final order by this Court approving the DIP Loan satisfactory to Lender, and (B) upon completion by Lender of satisfactory due diligence. The Lender shall complete the foregoing inspection and shall notify the Debtors of the results thereof as promptly as possible. (Term Sheet pp. 1-2).

---

[4] The emergency need for post-petition financing has necessitated the filing of this Motion prior to the execution of definitive documentation relating to the DIP Loan (the "DIP Documents"). However, the Term Sheet outlines the material terms of the DIP Loan, and any DIP Documents will be consistent with the terms of the Term Sheet. The Debtors will supplement this Motion by filing and/or making available for inspection, the applicable DIP Documents once available.

[5] This summary is qualified in its entirety by reference to the provisions of the Term Sheet, the eventual DIP Documents, and any order of this Court relating to the proposed post-petition financing described herein.

  (c) **Security.**

    (i) *First Priority Liens on the DMT Sapphire.*  Pursuant to Bankruptcy Code § 364(c)(2), the Lender shall be granted a perfected first priority lien on the DMT Sapphire to the extent that the DMT Sapphire is not encumbered.  (Term Sheet p. 2).

    (ii) *Preferred Ship Mortgage.*  The DMT Sapphire shall be subject to a preferred ship mortgage (the "<u>Mortgage</u>") in favor of the Lender that qualifies as a "preferred mortgage" under the provisions of Chapter 313 of Title 46 of the U.S. Code ("<u>Chapter 313</u>"), as amended, and the Debtors will comply with and satisfy all provisions of Chapter 313 necessary to establish and at all times maintain the Mortgage as a "preferred mortgage" under said Chapter 313  (Term Sheet p. 2).

    (iii) *Liens Priming Existing Liens.*  Pursuant to Bankruptcy Code § 364(d)(1), the Lender shall be granted a perfected first priority senior priming lien on the DMT Sapphire, to the extent that there are existing liens on the DMT Sapphire.  (Term Sheet p. 2).

    (iv) *Liens Junior to Existing Liens.*  Pursuant to Bankruptcy Code § 364(c)(3), the Lender shall be granted junior perfected liens on all property of the Debtors subject to existing valid, perfected, enforceable, and unavoidable liens on such property (other than DMT Sapphire).  (Term Sheet p. 2).

    (v) *Superpriority Claims.*  Pursuant to Bankruptcy Code § 364(c)(1), the Lender shall be granted an allowed superpriority administrative claim in these chapter 11 cases, having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 thereof).  (Term Sheet p. 2).

    (vi) *Carve Out.*  The liens granted to the Lender pursuant to the DIP Loan shall be subject to a carve-out for (a) allowed  fees and expenses of attorneys, accountants, financial advisors, and other professionals retained by the Debtors (the "<u>Debtors' Professionals</u>") pursuant to the Bankruptcy Code; (b) United States Trustee fees; and (c) any and all allowed fees and expenses of the Debtors' Professionals after the occurrence of an event of default or the end of the Term (as defined below) in an amount (exclusive of any retainers held by such Debtors' Professionals) not to exceed $300,000.00 (the "<u>Carve-Out</u>").   (Term Sheet p. 2).

  (d) **Use of Proceeds.**  The DIP Loan is being entered into in order to fund the general working capital needs of the Debtors during the pendency of these bankruptcy cases. The proceeds of the DIP Loan may be used to fund:  (i) the fees and expenses associated with the DIP Loan as agreed to by the Debtors, and (ii) the amounts described in the Debtors 17-week cash flow budget of receipts and disbursements, as approved by Lender (the "<u>Approved Budget</u>").  (Term Sheet p. 3).

  (e) **Term.**  The maturity date of the DIP Loan is the earlier of (i) June 30, 2010, (ii) the conversion or dismissal of these bankruptcy cases; or (iii) the effective date of a plan of reorganization for the Debtors.  (Term Sheet p. 3).

(f) **Interest Rate and Default Rate.**  The DIP Loan will bear interest at a base rate of fifteen percent (15%) per annum (the "Base Rate").  After the occurrence and during the continuance of an event of default, interest of the DIP Loan will bear interest at a rate equal to 4 percent (4%) plus the Base Rate.  Interest shall be due and payable on the last day of the Term.  Interest will be computed on the basis of a 360-day year.  (Term Sheet p. 3).

(g) **Fees.**  Debtors will pay Lender a commitment fee equal to 5 percent (5%) of the aggregate principal amount of the DIP Loan (the "Commitment Fee").  The Commitment Fee shall be payable to the Lender at the time that it makes the first advance to the Debtors.  In addition, at the end of the Term, the Debtors will pay Lender an exit fee equal to 2 percent (2%) of the aggregate principal amount of the DIP Loan (the "Exit Fee").  (Term Sheet p. 3).

(h) **Representations and Warranties.**  The Term Sheet contains various representations and warranties by the Debtors (to the extent set forth therein), with respect to, among other things, their organization and existence, ability to enter into the DIP Loan, ownership of the DMT Sapphire, and insurance.  (Term Sheet p. 4).

(i) **Covenants.**  The Term Sheet contains various affirmative covenants, relating to, among others:  (a) the Debtors' corporate authority to enter into the DIP Loan; (b) the Debtors' ownership of and authority to operate the DMT Sapphire; (c) timely payment of obligations; (d) the status of maritime liens related to the DMT Sapphire; (e) maintenance and insurance of the DMT Sapphire; (f) the safe and legal operation of the DMT Sapphire; (g) the appropriate maritime perfection of any liens on the DMT Sapphire arising under the DIP Loan; (h) the Lender's right to access the DMT Sapphire; (i) taxes related to the DMT Sapphire; (j) notice of any arrest, levy, custody, detention or seizure of the DMT Sapphire; and (k) compliance with preferred ship mortgage law regarding the liens on the DMT Sapphire in favor of the Lender.  (Term Sheet pp. 4-11).

(j) **Events of Default.**  The following constitute events of default pursuant to the Term Sheet:  Failure to make payments when due under the DIP Loan, non-compliance with covenants, impairment of collateral, appointment of chapter 11 trustee, examiner with extended powers or conversion of Bankruptcy Case to chapter 7, failure of Bankruptcy Court to issue a final order approving the DIP Loan by close of business on January 22, 2010, the Bankruptcy Court approving additional debtor-in-possession financing secured by a lien on the DMT Sapphire unless the proceeds of such additional debtor-in-possession financing are used to repay in full the DIP Loan and all accrued but unpaid amounts owing with respect thereto, and failure of the Debtors to, on or before March 15, 2010, either (a) file a motion pursuant to Section 363 of the Code seeking authority to sell the DMT Sapphire or other assets of the Debtor for amounts that are sufficient to repay in full the DIP Loan and all accrued but unpaid amounts owing with respect thereto or (b) file a plan of reorganization providing for the repayment in full of the DIP Loan and all accrued but unpaid amounts owing with respect thereto.  (Term Sheet p. 11).

(k) **Remedies Upon Default.**  Upon the occurrence of an event of default, the Lender may declare all principal and interest due and immediately payable.  The interim and final orders approving the DIP Loan shall provide that the automatic stay of section 362 of the Bankruptcy Code shall be modified to permit the Lender to exercise any and all remedies under the DIP Loan and applicable law, including setoff and foreclosure, upon written notice to the

Debtors, the United States Trustee and any statutory committees appointed in the Bankruptcy Case. At the election of Lender, upon the occurrence of a default, Lender shall have the right to exercise any and all remedies under the DIP Loan and applicable law, including foreclosure, as provided above. (Term Sheet pp. 11-12).

        (l) **Costs and Expenses.** Debtors shall bear all reasonable costs and expenses (including reasonable fees and expenses of Lender's counsel, accountants and other professional advisors to the Lenders) arising in connection with the preparation, execution and delivery of this Term Sheet and definitive loan documents, the review of the collateral securing the DIP Loan and the transactions contemplated thereby, including collateral monitoring, monitoring of and participation in the Bankruptcy Case by Lender. Payment of such costs and expenses shall not be subject to approval by the Bankruptcy Court, but if there is a dispute concerning the reasonableness of such fees, the Bankruptcy Court shall have jurisdiction to resolve such disputes. (Term Sheet p. 12).

        (m) **Indemnity.** The Debtors shall indemnify the Lender and its directors, officers, employees, attorneys, and affiliates for any loss, claim damage or liability arising out of or relating to the DIP Loan, or the use of proceeds thereof in accordance with customary provisions. The Debtors shall indemnify the Lender for its actual losses and costs incurred as a result of any and all unknown liens asserted against the DMT Sapphire to the extent such liens are allowed and determined to be superior to the liens granted to Lender pursuant to the DIP Loan. (Term Sheet pp. 12-13).

        (n) **DMT Sapphire Storage.** The DMT Sapphire will be kept in warm storage reasonably acceptable to Lender during the Term of the DIP Loan. The Lender agrees that, notwithstanding the foregoing, the DMT Sapphire may be removed from storage to allow for inspection, survey, appraisal and/or testing of such vessel or any equipment thereon by potential buyers or as otherwise reasonably necessary in connection with the attempted sale thereof; provided that (i) neither vessel may exit the jurisdictional waters of the United States without the prior approval of the Lender and (ii) the Lender shall be provided with reasonable notice of such removal and opportunity to be present. (Term Sheet p. 13).

        (o) **Right to Credit Bid.** To the extent the Debtors seek authority to sell the DMT Sapphire pursuant to 11 U.S.C. §363(b) or otherwise, Lender shall have the right to credit bid any amounts due and owing with respect to the DIP Loan, solely or in combination with any other consideration that the Lender deems appropriate. (Term Sheet p. 13).

### III. RELIEF REQUESTED

17. By this Motion, pursuant to Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014, the Debtors request:

        (a) authorization for the Debtors to borrow up to $3.1 million in principal amount of post-petition financing (the "DIP Financing"), including up to $1.5 on an interim basis

on the terms and conditions set forth in the Term Sheet as attached hereto and as summarized in this Motion, plus the Commitment Fee, Exit Fee and Lender's costs and expenses;

(b) authorization for the Debtors to execute and deliver any necessary DIP Documents, to perform such other and further acts as may be necessary or appropriate in connection therewith, and to grant the liens and security interests to the Lender as provided for in the Term Sheet and the eventual DIP Documents;

(c) authorization pursuant to Bankruptcy Code §§ 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) to grant certain liens and superpriority claims to the Lender to secure the Debtors' obligations under the DIP Documents;

(d) authorization for the Lender to accelerate the maturity of the DIP Loan and terminate the commitments under and in accordance with the Term Sheet and DIP Documents upon the occurrence and continuance of an event of default, subject to the provisions of this Motion and any order granting this Motion; and

(e) the Court to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") for this Court to consider entry of a final order (the "<u>Final Order</u>") authorizing and approving the relief requested in this Motion to become effective pursuant to the Final Order.

## IV.  BASIS FOR RELIEF

**Request for Approval of the DIP Facility and Related Actions**

18. As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient post-petition financing. The preservation of estate assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization (or maximize values under a liquidating plan of reorganization), all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

19. Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Bankruptcy

Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

20. Because the Debtors propose to obtain financing under the DIP Documents that is secured by junior and senior liens with respect to certain of the Debtors' property and to prime any liens that may exist on the DMT Sapphire, the approval of the DIP Facility is governed by Bankruptcy Code § 364(c) and 364(d).

**Financing Under Bankruptcy Code § 364(c)**

21. Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

22. The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code

§§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

23. Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);
- the credit transaction is necessary to preserve the assets of the estate; and
- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

24. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c). *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*. at 1088. Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky*

*Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

25. The Debtors had initial conversations with several potential post-petition lenders, none of which were willing to extend credit on an unsecured basis. Based on their discussions with such potential lenders, as well as the poor state of the credit markets, their own assets, and the general state of the oil and gas service industry, the Debtors strongly believe that they are unable to obtain unsecured financing from any capital source.

26. The Debtors and the Lender have engaged in arm's-length negotiations since the Petition Date, resulting in the financing proposal discussed in this Motion and proposed for approval by the Court. Accordingly, the Debtors believe that the terms and conditions outlined in the Term Sheet are reasonable and justified under the circumstances, in that this facility will enable the Debtors to have sufficient liquidity to continue with their operations and the plan process in a manner that will best serve all parties-in-interest herein.

**Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

27. The Debtors seek approval of the DIP Facility under Bankruptcy Code § 364(d)(l). Specifically, pursuant to the Term Sheet, the Lender would receive a perfected first priority, senior priming lien upon the DMT Sapphire, even to the extent that the DMT Sapphire was subject to any preexisting liens. The only alleged liens upon the DMT Sapphire that the Debtors are aware of are those claimed by Crossmar Inc., NREC Power Systems, Inc. and BNA Marine Services, LLC, as described above.

28. The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(d)(l) is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In connection with its efforts to obtain adequate post-

petition financing, the Debtors and their advisors do not believe that it would have been possible for the Debtors to obtain post-petition financing absent the granting of a first priority priming lien.

**Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection**

29. Any pre-petition secured creditors whose liens are being "primed" post-petition by the DIP Loan under Bankruptcy Code § 364(d) must be provided with adequate protection of their interests in collateral. *See In re Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under Bankruptcy Code § 364(d)(l)(B) to ensure that the creditor receives the value for which it bargained pre-bankruptcy).

30. "A sufficient equity cushion is itself a recognized form of adequate protection." *Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995). Further, "[a] classic method for finding adequate protection is the existence of an equity cushion. In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 677 (D. Ariz. 1994) (citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)); *see also*, *Mendoza v. Temple Inland Mortgage Corp. (In re Mendoza)*, 111 F. 3d 1264, 1272 (5th Cir. 1997) (stating that case law is nearly uniform in holding that an equity cushion of 20% or more constitutes adequate protection); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("It is clear that an equity cushion of 20% or more constitutes adequate protection"); *WMC Mortgage Corp. v. Cartwright (In re Cartwright)*, 2003 Bankr. LEXIS 2296 (Bankr. N.D. Tex. 2003) (finding that creditor was adequately protected by equity cushion); *In re Brokmeyer*, 51

B.R. 704, 706 (Bankr. S.D. Tex. 1985) (finding that equity cushion constitutes adequate protection).

31. The Debtors currently believe that the unencumbered value of the DMT Sapphire far exceeds the amount of the DIP Loan and the maritime liens alleged by Crossmar Inc., NREC Power Systems, Inc., and BNA Marine Services, LLC. While the nature of maritime liens is such that a particular party may assert a lien that has not been recorded with the appropriate agency, the Debtors believe that the value of the DMT Sapphire exceeds any possible non-consensual liens that could reasonably exist.[6]

**Protections Under Bankruptcy Code § 364(e)**

32. The Debtors believe that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith, at arm's length, and with the assistance of counsel on all sides. Accordingly, the Lender should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estates**

33. It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements. The DIP Loan also is essential to provide the Debtors' various stakeholders, including customers, employees, vendors, lessors, well operators, and other key constituencies, with confidence in the Debtors' ability to administer these cases and conclude their reorganization in a timely manner.

---

[6] A July 2009 appraisal of the DMT Sapphire assert a fair market value for the vessel of over $25 million.

34. Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could grind to a halt, which would seriously jeopardize the going-concern value of the Debtors' assets. The new liquidity offered by the proposed DIP Loan would ensure that the Debtors can maintain their assets and administer these cases through the next several months as the plan process ensues. Thus, approval of borrowing under the Term Sheet and eventual DIP Documents is crucial to maximizing the value of the Debtors' estates.

**The Terms of the DIP Agreement Are Fair, Reasonable, and Appropriate**

35. The proposed Term Sheet provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lenders are subject to the Carve-Out described above. In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

36. Likewise, the Debtors believe that the fees and other charges required by the Lender under the Term Sheet are reasonable and appropriate under the circumstances. The proposed fees under the Term Sheet are within the parameters of market fee structures for similar post-petition financing. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code § 364. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor-in-possession financing facility that included a lender "enhancement fee").

**Application of the Business Judgment Standard**

37. As described above, after appropriate investigation and analysis, the Debtors' management and advisors have concluded that the DIP Loan provides the best alternative available under the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer

to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

38.     The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the Term Sheet and DIP Documents. Accordingly, the Court should grant the Debtors the authority to enter into any necessary DIP Documents and obtain funds from the Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

**Request for Modification of the Automatic Stay**

39.     Bankruptcy Code § 362 provides for an automatic stay upon the filing of a bankruptcy case. As summarized above, the proposed Term Sheet contemplates a modification of the automatic stay to permit (a) the Debtors to grant certain liens under the DIP Documents and to perform the Debtors' liabilities and obligations to the Lender, and (b) the exercise of remedies by the Lender following an event of default. Upon the occurrence of an event of default and during the continuance thereof, the Lender is entitled to exercise its rights and remedies as set forth in the Term Sheet.

40.     The Debtors submit that, in the Debtors' business judgment, such provisions are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Term Sheet.

## V.  INTERIM RELIEF

41.     Pending final approval of the DIP Loan, the Debtors request that this Court authorize the Debtors to borrow under the DIP Documents on an interim basis, pursuant to Bankruptcy Rule 4001(c)(2), to the extent necessary to avoid immediate and irreparable harm to their business and to these chapter 11 cases prior to any final approval thereof.  It is essential to the continued maintenance of the Debtors' assets and these cases that the Court immediately authorize them to borrow up to $1.5 million pending a final hearing.  The Debtors urgently need funds to allow them to meet payroll and other current operating expenses, including, without limitation, insurance, fuel, docking, maintenance, lease, employee, and tax obligations as well as to pay their and others' professionals, and to otherwise continue their ongoing operations and generate necessary funds while they undertake the reorganization process.  Thus, the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate, fully warranted, and essential to the Debtors' efforts to maximize the value of their estates in these chapter 11 cases for the benefit of all of their creditors and parties-in-interest.

42.     Accordingly, pending a final hearing on the Motion, the Debtors respectfully request that the Court approve the terms of the Term Sheet on an interim basis pursuant to the terms of the proposed Interim Order.

WHEREFORE, premises considered, the Debtors request that this Court enter an Interim Order authorizing the Debtors to obtain the post-petition financing described herein on an

interim basis, setting the Motion for a final hearing, and granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By:  */s/ Marcy E. Kurtz*
Marcy E. Kurtz
Texas Bar No. 11768600
Marcy.Kurtz@bgllp.com
William A. (Trey) Wood III
Texas Bar No. 21916050
Trey.Wood@bgllp.com
Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bgllp.com
Bracewell & Giuliani LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone:     (713) 223-2300
Facsimile:      (713) 221-1212

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 15, 2009, a true and correct copy of this document was served on all parties on the attached master service list by electronic means as listed on the court's ECF noticing system, by electronic mail as indicated, and by United States first class mail, postage prepaid.

*/s/ Jason G. Cohen*
Jason G. Cohen