UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC., et al. | § | CASE NO. 09-39313-H1-11 |
| | § | (Chapter 11) |
| Debtor | § | (Consolidated) |

**RESPONSE AND OBJECTION OF CANDIES/KAZEMINY PARTIES TO
FIRST AND SECOND/FINAL FEE APPLICATIONS
OF GRANT THORNTON, LLP, FOR THE PROVISION OF MANAGEMENT
AND RESTRUCTURING SERVICES TO THE DEBTORS AND
JOHN BITTNER AS DEBTORS' CHIEF RESTRUCTURING OFFICER**

COME NOW Nasser Kazeminy, NJK Holding Corp. and DCC Ventures, LLC (collectively, the "Kazeminy Parties"), and Otto Candies, Jr., Otto Candies, III, Otto Candies, LLC and Candies Shipbuilders, LLC (collectively, the "Candies Parties") (collectively referred to as "Respondents"), by and through their attorneys, and for their Response and Objection (the "Objection") to the First Fee Application ("First Fee Application") and to the Second and Final Fee Application ("Second Fee Application" and collectively the "Applications") of Grant Thornton, LLP, for the Provision of Management and Restructuring Services to the Debtors and John Bittner as Debtors' Chief Restructuring Officer would respectfully show the Court as follows:

**PRELIMINARY STATEMENT**

1. Grant Thornton L.L.P. ("GT"), as management and restructuring advisors to the Debtors, seeks through the First Fee Application an award of $723,342.89 in fees and $42,639.14 in expenses. Through GT's Second Fee Application, GT seeks an award of $557,289.75 in fees and $29,529.90 in expenses.[1]

---

[1] Capitalized terms have the same meaning as provided in the Application.

{B0391452.1}

2. The First Fee Application covers the period of December 4, 2009, through March 31, 2010. The Second Fee Application covers the period between April 1, 2010, and July 9, 2010. Therefore, GT seeks a total of $1,280,632.60 in fees and $58,937.68[2] in expenses for only a period of approximately seven months.

3. In this Objection, Respondents respond to that portion of the Applications dealing with GT's request for approval of the fees and expenses incurred as the Debtors' management and restructuring advisors, as well for the services of John Bittner ("Bittner"), a GT employee and the Chief Restructuring Officer ("CRO") of the Debtors. As such, the primary issue before the Court is whether the amount sought by GT in the Applications is reasonable and necessary in accordance with 11 U.S.C. § 330, Fifth Circuit case law, and the guidelines of this District pertaining to the compensation of professionals in bankruptcy proceedings.

4. Certain components of the Applications deserve particularly close scrutiny. More specifically, certain requests in the Applications seek: (i) compensation for unnecessary services; (ii) compensation for services that did not provide a material benefit to the estate; and (iii) reimbursement of expenses without demonstrating that such expenses were allowable. For the reasons set forth herein, the Respondents object to the Applications and request that the Court reduce the amount of final fees and expenses awarded to GT accordingly. For the reasons described in further detail in later sections of this Objection, Respondents respectfully urge as follows:

    a. The Respondents request that the Court disallow $31,744.75 in fees requested in the First Fee Application and $15,952.00 in fees requested in the Second Fee

---

[2] Costs of $13,231.36 in the Second Fee Application are duplicate of costs sought by the First Fee Application, so $13,231.36 has been excluded from this total.

{B0391452.1}      2

Application for Clerical/Administrative/Supervisory Efforts. *See* Exhibits 1 and 2, respectively, attached hereto.

b. The Respondents further request that the Court disallow $13,231.36 in expenses requested in the Second Fee Application for payment by GT made to counsel to the CRO (a one-half portion being sought). No explanation is given for this requested payment or for the one-half reduction, and no authorization was obtained, as required, for retention of this professional. The full amount of the CRO's counsel fees of $26,462.72 was sought in the First Fee Application and was <u>not</u> approved. The decision not to approve that expense was correct and should not be modified.

c. The Respondents further request that the Court in its discretion disallow $16,176.39 in expenses requested in the First Fee Application and $16,290.54 in expenses requested in the Second Fee Application nearly all of which are for travel and meal costs, etc.

5. As discussed below, there are other issues raised in this Objection that challenge the reasonableness, necessity and/or material benefit to the estate of certain aspects of GT's and Bittner's work. The Respondents maintain that the Court can and should exercise its discretion to reduce the fees awarded to GT as to this other work as deemed appropriate. In addition to these specific downward adjustments to GT's fees and expenses, the Respondents request that the Court, in its discretion, apply a general percentage reduction to GT's remaining fees. Such percentage reductions are appropriate where an applicant's time records are impermissibly vague so as to hinder meaningful judicial review, when time entries are impermissibly "clumped," and/or when there appears to be excessive hours billed to the file. *See, e.g., Perdue v. Kenny A.*,

130 S. Ct. 1662, 1670-71 (2010) (noting without negative comment that (1) the district court applied a 15% discount to the applicant's fees because the time entries were too vague and appeared to contain excessive hours, and (2) the 11th Circuit stated that it "would have cut the billable hours more if [it] was deciding the matter in the first instance"); *In re Adventist Living Centers, Inc.*, 137 B.R. 692 (N.D. Ill 1991) (fees reduced by 50% due to lumping of services in fee application); *In re Leonard Jed Co.*, 103 B.R. 706 (Bankr. D. Md. 1989) (denying compensation for nearly all clumped-billed billing entries); *In re Seneca Oil Co.*, 65 B.R. 902, 909 (Bankr. W.D. Okla. 1986) (denying compensation for all clumped-billing time entries that contain both compensable and non-compensable activities); *In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719, 735 (Bankr. N.D. Ill. 1988) (denying compensation for all clump-billed entries). As will be discussed further herein, the time records of Bittner in particular, whose time is a significant portion of the compensation sought by GT, reflect extensive "lumping" of time entries.

## APPLICABLE LEGAL STANDARDS

6. GT bears the burden of proof in support of its Applications, and it is subject to close scrutiny by the Court. Statutory authority governing GT's requests in its Applications are found in 11 U.S.C. §§ 330 and 331, as well as Federal Rule of Bankruptcy Procedure 2016(a). The Fifth Circuit has provided further guidance to the Court in the form of factors the Court should consider when determining whether the requested compensation is reasonable. Finally, the Southern District of Texas has adopted certain guidelines to be considered by the Court.

**A.     GT Bears The Burden Of Demonstrating The Propriety Of The Requested Award In The Four Corners Of Its Applications.**

7. The fee applicant bears the burden of proof on its claim for compensation. *In re WNS, Inc.*, 150 B.R. 663, 664 (Bankr. S.D. Tex. 1993). "Generally, fee applications, standing

alone, must contain sufficient detail to demonstrate compliance with § 330. Any uncertainties due to poor record keeping are resolved against the applicant." *In re 530 W. 28th St., L.P.*, No. 08-13266, 2009 Bankr. LEXIS 4101, at *25 (Bankr. S.D.N.Y. Dec. 11, 2009) (citing *In re Poseidon Pools of Am.*, 216 B.R. 98, 100-01 (E.D.N.Y. 1997)); *see also In re New England Caterers, Inc.*, 115 B.R. 724, 729 (Bankr. D. Mass. 1989) ("An application for fees should be self-contained, including enough material on its face for [the court] to review the charges.").

**B.  Title 11 U.S.C. § 330(a)**

8.  Section 330(a) articulates the basic standards for compensation of professionals' fees and expenses in a bankruptcy case. More specifically, § 330(a)(1) permits the Court to award "reasonable compensation for actual, necessary services rendered" and to reimburse the applicant for "actual and necessary expenses" incurred. *See* 11 U.S.C § 330(a)(1)(A). The Court retains discretion, however, to award "less than the amount of compensation that is requested." *Id.* at § 330(a)(2). Moreover, § 330(a)(4)(A) makes it clear that "the court shall not allow compensation for":

(i)  unnecessary duplication of services; or

(ii)  services that were not –

(I)  reasonably likely to benefit the debtor's estate; or

(II)  necessary to the administration of the case.

*Id.* at § 330(a)(4)(A).

9.  To the extent that a fee applicant's requested compensation is not *per se* prohibited under subsection (a)(4), § 330(a)(3)(A) provides five non-exclusive factors for the Court's consideration in evaluating requests for compensation:

>In determining the amount of reasonable compensation to be awarded to … [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
>>(A) the time spent on such services;
>>
>>(B) the rates charged for such services;
>>
>>(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>>
>>(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>>
>>(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>>
>>(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*Id.* at § 330(a)(3)(A).

### C. Guidance From The Fifth Circuit

10. Similar to the factors addressed in § 330(a)(3)(a), the Fifth Circuit has directed courts to consider the following factors (the "*Johnson* Factors") when ruling on professionals' fee requests:

   a. the time and labor required;

    b.    the novelty and difficulty of the questions presented;

    c.    the skill requisite to perform the legal services properly;

    d.    the preclusion of other employment due to the acceptance of the case;

    e.    the customary fee;

    f.    whether the fee is fixed or contingent;

    g.    time limitations imposed by the client with the circumstances of the case;

    h.    the amount involved and the results obtained;

    i.    the experience, reputation and ability of the attorney;

    j.    the undesirability of the case;

    k.    the nature and length of the professional relationship with the client; and

    l.    awards in similar cases.

*In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298-99 (5th Cir. 1977) (adopting factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

    11.    Moreover, to the extent that the requested fees are otherwise compensable under § 330 after applying the *Johnson* Factors, the Fifth Circuit has further required the applicant to demonstrate that the underlying services "resulted in an identifiable, tangible, and material benefit to the bankruptcy estate." *Andrews & Kurth, LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998) ("*Pro-Snax*"); *see also In re Weaver*, 336 B.R. 115, 118-119 (Bankr. W.D. Tex. 2005) ("The Fifth Circuit Court of Appeals … set the standard by which bankruptcy courts must judge all attorneys fees for persons representing the bankruptcy estate."). The *Pro-Snax* "material benefit test" "does not look to the reasonableness of services or expenses at the time such services or expenses are incurred." *In re Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003). "Rather, the test is an objective after-the-fact test:

'whether … services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate,' regardless of the reasonableness of such services at the time that they were rendered." *Id.* (quoting *Pro-Snax*, 157 F.3d at 426).  Thus, "*Pro-Snax* adds a judicially-created hurdle for fee applicants to clear before being entitled to payment out of the estate – the applicant must show that its services materially benefited the estate." *Kaye v. Hughes and Luce, LLP*, No. 3:06-CV- 01863-B 2007, U.S. Dist. LEXIS 50929 at *29 (N.D. Tex. July 13, 2007).

### D. Guidelines From The Southern District of Texas

12. Finally, to assist applicants in preparing applications for compensation and to provide greater certainty to counsel in the fee process, the bankruptcy judges for the Southern District of Texas have adopted:  (i) the Guidelines for Attorneys' Fee Applications – Reimbursement of Expenses (the "Southern District Guidelines")[3] and (ii) the Guidelines for Compensation and Expense Reimbursement of Professionals in the Procedures for Complex Chapter 11 Cases (the "Complex Guidelines," and, together with the Southern District Guidelines, the "Guidelines").[4]  The Southern District Guidelines provide presumptions for allowable rates of various types of common expenses (*i.e.*, costs for faxes, copying, delivery, travel, research and postage), and the Complex Guidelines provide guidelines for practitioners in recording time and preparing fee applications.

### IV.
### ARGUMENT AND AUTHORITIES IN SUPPORT OF OBJECTION

13. The amounts requested in the Applications should be reduced on at least three grounds.  First, the Applications include requested compensation for unnecessary services.

---

[3] *See* General Order 2001-02 (*In the Matter of Guidelines for Fee Applications for Professionals – Uniform Presumptions Concerning Reimbursement Expenses*).

[4] *See* General Order 2009-02 (*In Re Adoption of Amendments to Bankruptcy Local Rule 1020, Complex Cases*) formerly governed by General Order 2000-2 (*In the Matter of Procedures for Complex Chapter 11 Cases*; B.L.R. 1075-1).

{B0391452.1}                                   8

Second, the Applications include requested compensation for services that did not provide a material benefit to the estate. Third, the Applications seek reimbursement of expenses without demonstrating that such expenses are allowable.

14. GT has not complied with certain portions of the Guidelines or has not provided sufficient information to determine whether the Applications are in compliance with the Guidelines. The Respondents request that any award be reduced for matters that are not in compliance with the Guidelines.

**A.    The Requested Award Should Be Reduced For Services That Were Unnecessary.**

15. The Applications affirmatively request an award for services that were unnecessary and are therefore not compensable. Specifically, GT's inappropriate requests for compensation fall into four general categories: (i) duplication of work by GT and the accounting staff at the Debtors; (ii) overstaffing; (iii) unclear time entries; and (iv) inappropriate tasks or rates. Moreover, GT has simply not shown that the overstaffed, unclear and/or inappropriate time entries were necessary to the administration of the case. 11 U.S.C. § 330(a)(4)(A)(II) ("[T]he court shall not allow compensation for … services that were not … necessary to the administration of the case."). The specific items mentioned below are merely examples of the foregoing. GT's request for compensation with respect to these categories should be reduced because – as described below – they were unnecessary and/or provided no benefit to the estate.

   *i.    Duplication Of Work*

16. GT unnecessarily duplicated work both among GT's own professionals and staff and with the Debtor's own accounting staff. GT is seeking more than $180,000.00 per month, a particularly excessive amount in light of the fact that GT also retained key employees of the Debtor. GT may not recover for this duplicative work. 11 U.S.C. § 330(a)(4)(A)(i).

Consequently, the amount sought by the Applications should be reduced to provide for reasonable compensation for only those non-duplicative and necessary services that actually provided a tangible and material benefit to the estate.

    *ii.    Overstaffing*

17. The bankruptcy estate should not have to bear the cost of overstaffing. *See In re Green Valley Beer*, 281 B.R. 253, 258 (Bankr. W.D. Pa. 2002); *see also* Jan Ostrovsky, *Doin' Time . . . And Getting Paid for It: A Report on the Enron Fee Examination Process*, 25-1 American Bankruptcy Institute Journal 32 (2006) (wherein the fee committee concluded that the proper staffing of a case was a key in determining whether fees were reasonable). As described more fully below, GT's overstaffing falls into two categories. First, GT employed an unnecessary number of professionals on tasks with no explanation for the use of multiple professionals. Second, GT used higher-rate, senior professionals to perform tasks that should have been performed by more junior professionals, or, in some instances, a staff member.

18. In this connection, Respondents note that GT is seeking payment of nearly $180,000.00 per month for many individuals who were not visible in any way to Respondents or their counsel—in addition to Mr. Bittner and the employees retained by the Debtor. This includes Mr. Gerbino, who is identified in GT's Applications as a director seeking $610.00 per hour, and Mr. Whetzel, identified as a manager seeking payment at $465.00 an hour.

    a.    Multiple professionals

19. Under the Guidelines, GT is required to provide an explanation for the necessity of having multiple professionals and paraprofessionals at the same meetings, hearings and other matters. Complex Guidelines, § II.E and F. The "[f]ailure to justify this time may result in compensation for only the person with the lowest billing rate." *Id*. at § II.E. GT's time entries

fall short of this requirement. Moreover, the entries of multiple timekeepers resulted in discrepancies concerning the amount of time spent on each task.

20. By way of example, the Application includes numerous time entries that do not contain any explanation why it was necessary to have more than one professional present (or why different timekeepers billed different amounts of time for performing the same task). While still falling short of the requirements under the Guidelines, other time entries only contain a conclusory explanation of the need for multiple professionals.

21. A debtor's estate must be administered as efficiently and economically as possible. *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1058 (5th Cir. 1986). In the absence of a clear explanation from GT of the extraordinary circumstances necessary to justify the need for multiple professionals on these projects, the standard of "one professional for one item" should be applied to projects undertaken by GT where multiple timekeepers were employed. In such instances, the Court should allow only the fees of the professional with the lowest billing rate and should strike the other timekeeper's entry.

      b. Inefficient use of professionals

22. An analysis of GT's billing records submitted with the Second Fee Application indicates that two timekeepers (out of the 21 total timekeepers, excluding Mr. Bittner)) accounted for approximately 69% of the fees GT invoiced. This leaves 19 timekeepers to account for only 31% of the total fees. This suggests an inefficient use of timekeepers, as it is certainly more efficient to use professionals regularly as opposed to having them perform one-off, discrete tasks, which require significant time for each timekeeper to familiarize himself with the case.

23. A cursory review of GT's fee invoices reveals a practice of staffing projects that could have been accomplished by lower-rate professionals (or staff) with much more experienced (and expensive) professionals. This practice led to the estate being charged more than was reasonable and necessary for the task. Another element that creeps into this review is the practice of staffing using GT's remote offices. One example of this is the time recorded for the services of Alan Dalsass, a firm director who appears to have been responsible for the vote tabulation in connection with the Debtors' plan. While his time is not extensive, Mr. Dalsass was "required" to appear in Houston for the confirmation hearing, traveling from his office in *New York*, for which the estate is asked to absorb his travel expenses totaling approximately $1,600.00.

    iii.    *Unclear billing*

24. A fee applicant's bills must be clear in order for a court to comply with its duties under § 330 to closely examine an application submitted for approval. In the instant case, many of GT's time entries (in particular those of Bittner) are improperly clumped or grouped and/or vague, which prevents a meaningful analysis by the Court and the parties. As described more fully below, the unclear time entries come in two varieties: (1) block or clumped billing, in which a professional would bill multiple tasks in one day without setting forth the amount of time spent on each task; and (2) vague entries where the task performed, or the subject of the task, is unclear or simply non-existent. In addition, compensation for these services must be reduced because GT cannot demonstrate that these services provided a material benefit to the estate. *See Pro-Snax,* 157 F.3d at 426.

      a.    Improperly clumped or grouped time entries

25. The Complex Guidelines require professionals to segregate matters: "[i]f a number of separate tasks are performed on a single day, the fee application should disclose the time spent for each such task, i.e., no 'grouping' or 'clumping.'" Complex Guidelines, § IID. Here, a mere sampling of GT's underlying invoices demonstrate that time entries were routinely clumped in violation of the Complex Guidelines. *See, e.g.*, Mr. Bittner entries which include extensive "block" billing in round numbers (6 hours, 7 hours, etc.) for all work purportedly done by him in a day. In the foregoing examples, there is no way to distinguish how much time was spent on a particular task to determine its reasonableness. The round numbers also suggest that time being billed was rounded up to the nearest hour, resulting in overbilling.

      b.    Vague time entries

26. The Complex Guidelines require a base level of detail for time entries. "At a minimum, the time entries should identify the person performing the service, the date(s) performed, what was done, and the subject involved. Mere notations of telephone call, conferences, research, drafting, etc., without identifying the matter involved, may result in disallowance of the time covered by the entries." Complex Guidelines § II.C; *see also In re Burival*, No. BK07-42271-TLS, Ch. 11, No. BK07-42273-TLS, Ch. 11, 2009 Bankr. LEXIS 2203, at *6 (Bankr. D. Neb. July 21, 2009) ("Vague fee applications that 'camouflage' the amount of time spent on each task and hinder the court's scrutiny of the reasonableness of the time expended can lead to reduced fee awards.") (citing *In re Baker*, 374 B.R. 489, 495 (Bankr. E.D.N.Y. 2007)).

*iv.     Inappropriate tasks or rates*

27.     The Application contains numerous inappropriate requests, including (i) overhead costs, such as billing for filing and other clerical or administrative tasks; (ii) non-work travel time at full rates.

28.     The Complex Guidelines prohibit the recovery of fees for administrative functions: "Time spent in addressing, stamping and stuffing envelopes, filing, photocopying or 'supervising' any of the foregoing is generally not compensable, whether performed by a professional, paraprofessional, or secretary." Complex Guidelines, II.H; *see also In re Bennett Funding Group, Inc.*, 213 B.R. 234, 248 (Bankr. N.D.N.Y. 1997) (reducing fee requests for purely clerical matters by 15%); *In re Fibermark, Inc.*, 349 B.R. 385, 400 (Bankr. D. Vt. 2006) (holding overhead expense will be "denied reimbursement categorically"). Similarly, the Southern District Guidelines provide that professionals may not be compensated for services that are essentially clerical in nature absent "very exceptional circumstances, such as emergency preparation for major trials or other exigent circumstances." Southern District Guidelines, § E. Moreover, even as to what purports to be an exigent circumstance, the Southern District Guidelines provide that "[m]ultiple claims in the same case may be considered as indicative of inadequate workflow planning and inadequate staffing, and thus not allowed." *Id*.

29.     For example, Exhibit D of GT's Applications is GT's billing time detailed by "task code." Three of these items are of particular concern. First, project code number 1 is for general "engagement planning, supervision and administration." The Second Fee Application has a total of 54 hours with this code for a total in fees of approximately $33,000. The First Fee Application has a total of 40.6 hours with this code for more than $20,000 in fees requested.

Again, this does not include Mr. Bittner's time, so it is surprising that in that period of time GT would seek such extensive payment for mere supervision and administration.

30. The second item is project code 12 which is entitled "Claims administration and objections including analysis of inter-company and inter-creditor claims and issues." This includes 176.9 hours on the Second Fee Application for over $47,000 in fees. The First Fee Application contains 99.5 hours under this code for more than $24,000. Again, this does not include Bittner's time. As it is only since plan confirmation (after the periods covered by both Applications) that objections have been filed to any claim, the pre-confirmation activities in this area would seem to be relatively ministerial, requiring, at most, the attention of a clerical employee of the Debtors.

31. The third troubling project code item is code 26, entitled "Other diligence on case structure, litigation, public documents, data room contents and other matters." This is another 174 hours of time on the Second Fee Application for $47,000 in fees and 55.9 hours on the First Fee Application for more than $19,000, totaling $66,000 with this code. This is a vague group of billing time, and it is seemingly duplicative since, for example, the data room contents seemed nearly exclusively related to the sale of the assets which is covered by other project codes (22 and 21). And again, this $66,000 is for fees of GT personnel (during only approximately seven months) in <u>addition</u> to Mr. Bittner. Mr. Bittner billed an additional $60,000 to $90,000 <u>per month</u> for his fees.

**B.   The Requested Compensation Should Be Reduced For Services That Failed To Provide A Material Benefit To The Estate.**

32. In addition to the objections referenced above and below concerning inefficiencies and improper billing in violation of the Guidelines, the Application should also be

reduced because GT has failed to establish that certain specific services rendered were necessary and/or provided a material benefit to the estate.

33. Examples of such services that failed to provide a material benefit to the estate include (i) extensive billing to "review proofs of claims"[5] prior to confirmation of the Plan, long before any objections were filed by GT to any claims, particularly in light of the fact that additional time to "review proofs of claims" will likely be billed again in the subsequent period prior to filing the objections; (ii) administrative and other supervisory work described elsewhere in this Objection; and (iii) fees for multiple personnel to attend conferences or otherwise perform the same task as discussed elsewhere in the Objection.

34. Finally, in general, Respondents object to the sheer volume of fees being requested. Bankruptcy counsel and others have stated that the liquidation plan has gone quite well and that there have been no serious complications or delays. Yet GT, so far, is seeking $1,280,632.60 in fees through July 9, 2010. Additionally, separate fee applications for similar amounts have been filed by Bracewell & Giuliani, LLP, as counsel for the Debtors and by McKool Smith P.C. as counsel for the Official Committee of Unsecured Creditors (which firm has also performed, and is performing, work representing Bittner as Liquidating Trustee in this case). The compensation requested by GT is, of course, in addition to amounts paid (and being paid) to the employees of the Debtor. As can be seen by the Fee Applications of those firms and various objections to those Applications, the fees sought by Bracewell & Giuliani, McKool Smith and GT total $3,850,383 only through July 9, 2010. That date is actually before most objections to Proofs of Claims were filed and before the Liquidating Trustee filed his Complaint

---

[5] As a large amount of time related to the claims of the Respondents are also the subject of compensation requests by the firm of McKool Smith, the issue of duplication of effort by the various professional groups should also be the subject of this Court's close scrutiny.

{B0391452.1}  16

against Respondents (on July 16, 2010).[6] Little litigation has yet proceeded on any of the adversary proceedings in this Bankruptcy (with the exception of the adversary proceeding instituted to enjoin the Delaware shareholder litigation,[7] which has only proceeded haltingly and is now in a state of abatement). In this light, in addition to the specific GT fee and cost items addressed herein, GT's fees are exorbitant and should be reduced by a substantial percentage as excessive.

C.     **GT Violated The Guidelines For Expenses.**

35.    GT's Applications requesting reimbursement of a variety of expenses totaling more than $32,466.93 (consisting of $16,176.39 in the First Fee Application and $16,290.54 in the Second) fail to comply with the Guidelines. Professionals must "furnish enough specificity for the Court to establish whether a given expense was both actual and necessary." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005) (quoting *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 834 (Bankr. D. Vt. 1987)). Expenses are "actual" if they are incurred and not based on a formula or *pro rata* calculation. *See In re Bennett Funding Group*, 213 B.R. at 244. Expenses are "necessary" if they were "required to accomplish the proper representation of the client." *In re Am. Preferred Prescription, Inc.*, 218 B.R. 680, 686-87 (Bankr. E.D.N.Y. 1998) (citing *In re Spanier Bros., Inc.*, 203 B.R. 85, 91 (Bankr. N.D. Ill. 1996)). While the Applications subdivide their underlying expenses into categories, they provide no detail to determine whether the expenses are otherwise compensable under § 330 or the Guidelines.[8] For example, the Guidelines provide, *inter alia*:

---

[6]    The adversary proceeding against the Respondents is docketed as Adversary No. 10-3312.
[7]    Adversary No. 09-31313, styled *Deep Marine Holdings, Inc., et al. v. FLI Deep Marine LLC, et al.*
[8]    One example of the charging of expenses for which the compensability is indiscernible is certain expense charges by a Mr./Ms. Vellani, whose daily expenses included "excessive mileage" of $24.00 and "toll charges" of $9.00. Whether these items, though not of great magnitude in the circumstance of this case, were expended for the benefit of the Debtors—or were just the cost of coming to work—is unknown.

III. Expenses

\* \* \*

H. Professional Services. A professional employed under § 327 may not employ, and charge as an expense, another professional (e.g., special litigation counsel employing an expert witness) unless the employment of the second professional is approved by the Court prior to the rendering of service.

\* \* \*

Q. Air Transportation. Air travel is expected to be at regular coach fare for all flights.

R. Hotels. Due to wide variation in hotel costs in various cities, it is not possible to establish a single guideline for this type of expense. All persons will be required to exercise reasonable discretion and prudence in connection with hotel expenditures.

\* \* \*

T. Meals (Working). Working meals at restaurants or private clubs are not reimbursable. Reasonable reimbursement may be sought for working meals only where food is catered to the professional's office in the course of a meeting with clients, such as a Creditors' Committee, for the purpose of allowing the meeting to continue through a normal meal period.

36. A prime example of the expenses improperly billed to the Estate by GT relate to the activities in Houston of Mr. Bittner, who offices and resides in Dallas. Not only was the Estate billed for transportation expenses[9] of Mr. Bittner, but significant expenses are for his "out of town meals" in Houston. In short, if GT elected to staff the engagement in Houston with professionals, particularly its lead professional, who resided outside of Houston, those expenses should be borne by GT and not by the bankruptcy estate. Additionally, GT's request for payment for computer hardware is inappropriate.

37. Another expense that should not be paid is the $26,462.72 expense incurred to hire counsel for the CRO. No explanation is provided as to why the CRO, who had the assistance of counsel for the Debtors in matters relating to the bankruptcy estates, needed the

---

[9] Those transportation expenses appear to not only include his airfare to and from Dallas, but were usually accompanied by the necessity of renting a car and lodging expenses for each trip to Houston.

services of outside counsel.  This expense was not approved when sought in the First Fee Application, and without explanation, GT has placed it in its Second Fee Application.  Although GT attempts to sidestep this issue by only requesting reimbursement for one-half of the expense of its counsel this time, absent a full explanation, no part of the services should be reimbursed by the estates.

    WHEREFORE, PREMISES CONSIDERED, the Respondents respectfully pray that the Court reduce the amount of fees and expenses allowable in the Applications as herein requested, or as it may, in its discretion, adjust, and that they have such other and further relief to which they may be entitled.

    Dated:  October 4, 2010

THOMAS S. HENDERSON, Attorney At Law

By: _____

  Thomas S. Henderson (TBA No. 09432300)

South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas 77002-2716
Telephone: (713) 227-9500
Facsimile:   (713) 620-3023

COUNSEL FOR THE RESPONDENTS

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing pleading has been served on the parties listed on the attached Service List by ECF filing or first class mail on the 4th day of October, 2010.

_____
Thomas S. Henderson

{B0391452.1}    19