UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC., et al. | § | CASE NO. 09-39313-H1-11 |
| | § | (Chapter 11) |
| Debtor | § | (Consolidated) |

**RESPONSE AND OBJECTION OF CANDIES/KAZEMINY PARTIES TO
FIRST AND SECOND/FINAL FEE APPLICATIONS OF MCKOOL SMITH, P.C.,
COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES
<u>RENDERED AND REIMBURSEMENT OF EXPENSES</u>**

COME NOW Nasser Kazeminy, NJK Holding Corp. and DCC Ventures, LLC (collectively, the "Kazeminy Parties"), and Otto Candies, Jr., Otto Candies, III, Otto Candies, LLC and Candies Shipbuilders, LLC (collectively, the "Candies Parties") (collectively referred to as "Respondents"), by and through their attorneys, and for their Response and Objection (the "Objection") to the First Fee Application ("First Fee Application")[1] and Second and Final Fee Application of McKool Smith, P.C., Counsel To the Official Committee of Unsecured Creditors, for Allowance and Payment of Compensation for Services Rendered and Reimbursement of Expenses, (the "Second Fee Application" and collectively, the "Applications") would respectfully show the Court as follows:

PRELIMINARY STATEMENT

1.   McKool Smith, P.C. ("McKool"), as counsel for the official committee of unsecured creditors, seeks through the First Fee Application $489,656.91 in fees and $6,804.88 in expenses. Through its Second Fee Application, McKool requests an award of $787,919.42 in

---

[1] Although the First Application was previously allowed on an interim basis, the Respondents, in their response thereto, docketed at Docket No. 432, specifically reserved their objections to the First Application for consideration in connection with the final fee application herein.

- 1 -

fees and $42,618.86 in expenses. McKool Smith also requests $15,000 allegedly related to the preparation of the Second Fee Application.[2]

2. The First Fee Application covers the period of December 17, 2009, through March 31, 2010. The Second Fee Application covers the period between April 1, 2010, and July 9, 2010. Therefore, McKool seeks a total of $1,292,576.33 in fees and $49,423.74 in expenses for only a period of approximately seven months. Importantly, McKool, representing the Unsecured Creditors Committee, are requesting more in compensation than Bracewell & Giuliani, counsel for the debtor, which firm undoubtedly performed substantially more work that directly benefited the bankruptcy estate.

3. In this Objection, Respondents respond to that portion of the Applications dealing with McKool's request for final approval of the fees and expenses incurred as counsel for the unsecured creditors committee. As such, the primary issue before the Court is whether the amount sought by McKool in the Applications is reasonable and necessary in accordance with 11 U.S.C. § 330, Fifth Circuit case law, and the guidelines of this District pertaining to the compensation of professionals in bankruptcy proceedings.

4. Certain components of the Applications deserve particularly close scrutiny. More specifically, certain requests in the Applications seek: (i) compensation for unnecessary services; (ii) compensation for services that did not provide a material benefit to the estate; and (iii) reimbursement of expenses without demonstrating that such expenses were allowable. For the reasons set forth herein, the Respondents object to the Applications and request that the Court reduce the amount of final fees and expenses awarded to McKool accordingly.

---

[2] As McKool aptly noted in its recently filed Trustee's Supplemental Objection To Application of Greenberg Traurig, LLP For Allowance of Substantial Contribution Claim (Document 724 in Case 09-39313), it is hard to imagine how the preparation of a fee application benefited the estate in any way.

5.  The Respondents request that the Court disallow, at least, $287,938.75 in fees requested in the Applications as follows:

   a.  Inadequate Descriptions or Repeated Vague Descriptors: $268,097.75 (*See* Exhibit A and Exhibit B.)

   b.  Clerical/Administrative Efforts: $19,841 (*See* Exhibit C.)

6.  Additionally, the Respondents further request that the Court disallow $222,082.50[3] (*See* Exhibit B) in fees requested in the Applications for the following tasks that failed to provide a material benefit to the estate and which are vaguely and inappropriately described in the Applications:

   a.  Mark Mathie, a principal who charged the estate $540 per hour, billed 231.2 hours, totaling $124,848, to one billing description: "Review materials relating to potential claims and research issues relating to potential claims against company insiders."

   b.  Garrett Chambers, a principal who charged the estate $465 per hour, billed 80.3 hours, totaling $37,339.50, to one billing description: "Review documents and research issues relating to potential claims."

   c.  Jennifer Truelove, an associate who charged the estate $500 per hour, billed 52.6 hours, totaling $26,300, to vague billing descriptions related to "Review documents regarding potential claims against insiders" and "Research issues relating to potential claims against company insiders."

   d.  Paul Williams, an associate who charged the estate $450 per hour, billed 45.1 hours, totaling $20,295, to one billing description: "Analyze materials related

---

[3] This total is part of the $268,097.75 requested be disallowed pursuant to section 5(a). As such, if the Court grants the relief requested in section 5(a) in its entirety, the amount disallowed pursuant to section 6 should be $46,015.25.

- 3 -

to research on potential claims against company insiders; research regarding same."

e. Ivan Wang, an associate who charged the estate $350 per hour, billed 38 hours, totaling $13,300, to two vague billing descriptions: "Continue to research issues relating to potential claims against company insiders" or "Research issues relating to potential claims against company insiders."

7. The above are a few of the more egregious examples of McKool's excessive billing that did not provide any benefit to the estate. As more-fully explained in Respondents' Motion to Dismiss Complaint and/or Strike Pleadings for Violation of Fed. R. Bankr. P. 9011 and for Imposition of Monetary Sanctions (the "Sanctions Motion"), McKool decided to completely ignore the fact that Greenberg Traurig, counsel to the Special Litigation Committee of the Board of Directors of the Debtor, conducted an extensive investigation of various claims asserted against the Debtor and its shareholders and management that included (i) 24 interviews, (ii) hundreds of hours of research regarding many of the same claims that McKool purportedly researched, (iii) reviewed the same documents that have been made available to McKool, and (iv) ultimately drafted a 400 page Special Litigation Committee Report that determined that Respondents (and other representatives of the Debtor) had not engaged in any wrongful conduct and that it was not in the estate's interest to pursue causes of action against Respondents.

8. McKool's decision to totally disregard the SLC Report and investigation reveals that McKool frivolously billed to a bankruptcy estate hundreds of thousands of dollars that a regular fee-paying client would never be expected to pay. There are other issues raised in this response and objection that challenge the reasonableness, necessity, and/or material benefit to

the estate of certain aspects of McKool's work. The Respondents maintain that the Court can and should exercise its discretion to reduce the fees awarded to McKool as to this other work as deemed appropriate.

9. The Respondents further request that the Court disallow $135,933.24 in attorneys' fees that is inappropriately "block-billed" or "clumped." (*See* Exhibit D.)

10. The Respondents further request that the Court in its discretion disallow $6,639.95 in expenses requested in the Applications as follows:

    a.     $3,084.30 in airfare[4] for attorneys from McKool's Dallas office to travel to Houston or attorneys from McKool's Houston office to travel to Dallas.[5]

    b.     $2,611.70 in hotel rooms for attorneys from McKool's Dallas office when they visit Houston.

    c.     $943.95 in parking and cab fares for McKool's attorneys while travelling, principally between Houston and Dallas.

11. In addition to these specific downward adjustments to McKool's fees and expenses, the Respondents request that the Court, in its discretion, apply a general percentage reduction to McKool's remaining fees. Such percentage reductions are appropriate where an applicant's time records are impermissibly vague so as to hinder meaningful judicial review, when time entries are impermissibly "clumped," and/or when there appears to be excessive hours billed to the file. *See, e.g., Perdue v. Kenny A.*, 130 S. Ct. 1662, 1670-71 (2010) (noting without negative comment that (1) the district court applied a 15% discount to the applicant's fees because the time entries were too vague and appeared to contain excessive hours and (2) that the

---

[4]     Further, in violation of the applicable rules, McKool also billed much of their travel time at the attorney's full hourly rate.

[5]     It is hard to imagine how a law firm that represented itself as being capable of acting in the best interests of the estate found it appropriate to bill thousands of dollars of expenses to the estate, and thus reducing the amount recoverable by all creditors, including its clients, to "import" attorneys from other offices.

11th Circuit stated that it "would have cut the billable hours more if [it] was deciding the matter in the first instance"); *In re Adventist Living Centers, Inc*., 137 B.R. 692 (N.D. Ill 1991) (fees reduced by 50% due to lumping of services in fee application); *In re Leonard Jed Co*., 103 B.R. 706 (Bankr. D. Md. 1989) (denying compensation for nearly all clumped-billed billing entries); *In re Seneca Oil Co*., 65 B.R. 902, 909 (Bankr. W.D. Okla. 1986) (denying compensation for all clumped-billing time entries that contain both compensable and non-compensable activities); *In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719, 735 (Bankr. N.D. Ill. 1988) (denying compensation for all clump-billed entries).

## APPLICABLE LEGAL STANDARDS

12. McKool bears the burden of proof in support of its Applications, and it is subject to close scrutiny by the Court. Statutory authority governing McKool's requests in its Applications are found in 11 U.S.C. §§ 330 and 331, as well as Federal Rule of Bankruptcy Procedure 2016(a). The Fifth Circuit has provided further guidance to the Court in the form of factors the Court should consider when determining whether the requested compensation is reasonable. Finally, the Southern District of Texas has adopted certain guidelines to be considered by the Court.

**A.  McKool Bears The Burden Of Demonstrating The Propriety Of The Requested Award In The Four Corners Of The Applications.**

13. The fee applicant bears the burden of proof on its claim for compensation. *In re WNS, Inc*., 150 B.R. 663, 664 (Bankr. S.D. Tex. 1993). "Generally, fee applications, standing alone, must contain sufficient detail to demonstrate compliance with § 330. Any uncertainties due to poor record keeping are resolved against the applicant." *In re 530 W. 28th St., L.P.*, No. 08-13266, 2009 Bankr. LEXIS 4101, at *25 (Bankr. S.D.N.Y. Dec. 11, 2009) (citations omitted) (citing *In re Poseidon Pools of Am.*, 216 B.R. 98, 100-01 (E.D.N.Y. 1997)); *see also*

*In re New England Caterers, Inc*., 115 B.R. 724, 729 (Bankr. D. Mass. 1989) ("An application for fees should be self-contained, including enough material on its face for [the court] to review the charges.").

**B.     Title 11 U.S.C. § 330(a)**

14.     Section 330(a) articulates the basic standards for compensation of professionals' fees and expenses in a bankruptcy case. More specifically, § 330(a)(1) permits the Court to award "reasonable compensation for actual, necessary services rendered" and to reimburse the applicant for "actual and necessary expenses" incurred. *See* 11 U.S.C § 330(a)(1)(A). The Court retains discretion, however, to award "less than the amount of compensation that is requested." *Id*. at § 330(a)(2). Moreover, § 330(a)(4)(A) makes it clear that "the court shall not allow compensation for":

    (i) unnecessary duplication of services; or

    (ii) services that were not –

        (I) reasonably likely to benefit the debtor's estate; or

        (II) necessary to the administration of the case.

*Id.* at § 330(a)(4)(A).

15.     To the extent that a fee applicant's requested compensation is not *per se* prohibited under subsection (a)(4), § 330(a)(3)(A) provides five non-exclusive factors for the Court's consideration in evaluating requests for compensation:

> In determining the amount of reasonable compensation to be awarded to … [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
>     (A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*Id.* at § 330(a)(3)(A).

## C. Guidance From The Fifth Circuit

16. Similar to the factors addressed in § 330(a)(3)(a), the Fifth Circuit has directed courts to consider the following factors (the "*Johnson* Factors") when ruling on professionals' fee requests:

    a.    the time and labor required;

    b.    the novelty and difficulty of the questions presented;

    c.    the skill requisite to perform the legal services properly;

    d.    the preclusion of other employment due to the acceptance of the case;

    e.    the customary fee;

    f.  whether the fee is fixed or contingent;

    g.  time limitations imposed by the client with the circumstances of the case;

    h.  the amount involved and the results obtained;

    i.  the experience, reputation and ability of the attorney;

    j.  the undesirability of the case;

    k.  the nature and length of the professional relationship with the client; and

    l.  awards in similar cases.

*In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298-99 (5th Cir. 1977) (adopting factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

  17.  Moreover, to the extent that the requested fees are otherwise compensable under §330 after applying the *Johnson* Factors, the Fifth Circuit has further required the applicant to demonstrate that the underlying services "resulted in an identifiable, tangible, and material benefit to the bankruptcy estate." *Andrews & Kurth, LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998) ("*Pro-Snax*"); *see also In re Weaver*, 336 B.R. 115, 118-119 (Bankr. W.D. Tex. 2005) ("The Fifth Circuit Court of Appeals . . . set the standard by which bankruptcy courts must judge all attorneys['] fees for persons representing the bankruptcy estate."). The *Pro-Snax* "material benefit test" "does not look to the reasonableness of services or expenses at the time such services or expenses are incurred." *In re Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003). "Rather, the test is an objective after-the-fact test: 'whether . . . services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate,' regardless of the reasonableness of such services at the time that they were rendered." *Id*. (quoting *Pro-Snax*, 157 F.3d at 426). Thus, "*Pro-Snax* adds a judicially-created hurdle for fee applicants to clear before being entitled to payment out of the estate – the applicant must show

that its services materially benefited the estate." *Kaye v. Hughes and Luce, LLP*, No. 3:06-CV-01863-B 2007, U.S. Dist. LEXIS 50929 at *29 (N.D. Tex. July 13, 2007).

### D. Guidelines From The Southern District of Texas

18. Finally, to assist applicants in preparing applications for compensation and to provide greater certainty to counsel in the fee process, the bankruptcy judges for the Southern District of Texas have adopted: (i) the Guidelines for Attorneys' Fee Applications – Reimbursement of Expenses (the "Southern District Guidelines")[6] and (ii) the Guidelines for Compensation and Expense Reimbursement of Professionals in the Procedures for Complex Chapter 11 Cases (the "Complex Guidelines," and, together with the Southern District Guidelines, the "Guidelines").[7] The Southern District Guidelines provide presumptions for allowable rates of various types of common expenses (*i.e.*, costs for faxes, copying, delivery, travel, research and postage), and the Complex Guidelines provide guidelines for practitioners in recording time and preparing fee applications.

### ARGUMENT AND AUTHORITIES IN SUPPORT OF OBJECTION

19. The amounts allowed from the Applications should be reduced on at least three grounds. First, the Applications include requested compensation for unnecessary services. Second, the Applications include requested compensation for services that did not provide a material benefit to the estate. Third, the Applications seek reimbursement of expenses without demonstrating that such expenses are allowable.

---

[6] *See* General Order 2001-02 (*In the Matter of Guidelines for Fee Applications for Professionals – Uniform Presumptions Concerning Reimbursement Expenses*).

[7] *See* General Order 2009-02 (*In Re Adoption of Amendments to Bankruptcy Local Rule 1020, Complex Cases*) formerly governed by General Order 2000-2 (*In the Matter of Procedures for Complex Chapter 11 Cases*; B.L.R. 1075-1).

**A.      The Requested Award Should Be Reduced For Services That Were Unnecessary.**

20.     The Applications affirmatively request an award for services that were unnecessary and are therefore not compensable. Specifically, McKool's inappropriate requests for compensation fall into four general categories: (i) duplication of work by McKool that was already completed by Greenberg Traurig as part of the SLC investigation;[8] (ii) overstaffing; (iii) unclear time entries; and (iv) inappropriate tasks or rates. Moreover, McKool has simply not shown that the overstaffed, unclear and/or inappropriate time entries were necessary to the administration of the case. 11 U.S.C. § 330(a)(4)(A)(II) ("[T]he court shall not allow compensation for … services that were not … necessary to the administration of the case."). The specific items mentioned below are merely examples of the foregoing. McKool's request for compensation with respect to these categories should be reduced because – as described below – they were unnecessary and/or provided no benefit to the estate.

   *1.      Duplication Of Work*

21.     McKool unnecessarily duplicated work performed by both multiple McKool attorneys and the counsel for the Special Litigation Committee. McKool may not recover for this duplicative work. 11 U.S.C. § 330(a)(4)(A)(i). Consequently, the amounts awarded through the Applications should be reduced to provide for reasonable compensation for only those non-

---

[8]     Even if McKool was allowed to look into the allegations that are the subject of the Trustee's Complaint against Respondents and that were already rejected the SLC Report, it was ridiculous for McKool to bill the estate at least $388,567.69 to start their own investigation in complete disregard of the exhaustive Greenberg Traurig investigation. (*See* Exhibits B & E.) To be clear, McKool did not investigate the claims. McKool did not conduct a single witness interview, nor did it ever consult with counsel from Greenberg Traurig or obtain any information that Greenberg Traurig had not already obtained and considered. McKool simply, at best, recorded hundreds of attorney hours (i) re-reviewing documents that had already been determined to exculpate Respondents, and (ii) researching legal issues related to pedestrian claims. McKool simply went through this charade, knowing that it would be able to bill the estate for its "efforts." As such, McKool's award should be reduced by the $388,567.69 attributable to this "recreation of the wheel." It must also be noted that the $388,567.69 figure was conservatively arrived at by only adding the specific entries that were clearly attributable to McKool's "investigation" and the bringing of the Adversary Complaint against Respondents and further do not take into account any "costs." Lastly, this figure does include the $222,082.50 described in paragraph 6.

duplicative and necessary services that actually provided a tangible and material benefit to the estate.

   2.   *Overstaffing*

   22.   The bankruptcy estate should not have to bear the cost of overstaffing. *See In re Green* Valley *Beer*, 281 B.R. 253, 258 (Bankr. W.D. Pa. 2002); *see also* Jan Ostrovsky, *Doin' Time . . . And Getting Paid for It: A Report on the Enron Fee Examination Process*, 25-1 American Bankruptcy Institute Journal 32 (2006) (wherein the fee committee concluded that the proper staffing of a case was a key in determining whether fees were reasonable). As described more fully below, McKool's overstaffing falls into two categories. First, McKool employed an unnecessary number of attorneys on tasks with no explanation for the use of the multitude of attorneys. Second, McKool used higher-rate, senior attorneys to perform tasks that should have been performed by more junior attorneys, or, in some instances, a staff member.

   a.   Multiple Professionals

   23.   Under the Guidelines, McKool is required to provide an explanation for the necessity of having multiple professionals and paraprofessionals at the same meetings, hearings and other matters. Complex Guidelines, § II.E and F. The "[f]ailure to justify this time may result in compensation for only the person with the lowest billing rate." *Id*. at § II.E. McKool's time entries fall short of this requirement. Moreover, the entries of multiple timekeepers resulted in discrepancies concerning the amount of time spent on each task.

   24.   By way of example, the Applications include numerous time entries that do not contain any explanation for why it was necessary to have more than one professional present (or why different timekeepers billed different amounts of time for performing the task). While still falling short of the requirements under the Guidelines, other time entries only contain a

conclusory explanation of the need for multiple professionals. Multiple examples of such behavior are when multiple McKool attorneys, often partners, attended meetings and hearings in this matter. The most recent of these situations, though not the subject of these Applications, occurred at the September 27, 2010 status hearing, where no less than five McKool professionals, including at least two from Dallas, and not less than three principals of the firm (whose aggregate billing rate exceeds $1,675 per hour) appeared in the courtroom for a thirty-minute status conference *at which only one McKool attorney spoke*.

25. A debtor's estate must be administered as efficiently and economically as possible. *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1058 (5th Cir. 1986). In the absence of a clear explanation from McKool of the extraordinary circumstances justifying the need for multiple attorneys on these projects, the standard of "one attorney for one item" should also apply to projects undertaken by McKool where multiple timekeepers were employed. In such instances, the Court should allow only the fees of the professional with the lowest billing rate.

    b.    Inefficient use of professionals

26. An analysis of McKool's billing records indicates that five timekeepers (out of the twenty total timekeepers who billed time to the bankruptcy case)[9] accounted for approximately 63% of the fees McKool invoiced. This leaves 15 timekeepers to account for the remaining 37% of the total fees. This suggests an inefficient use of timekeepers, as it is certainly more efficient to use professionals regularly as opposed to one-off, discrete tasks, which require significant time for the timekeeper to familiarize himself with the case. Further, McKool almost exclusively used more expensive principals for all matters of this case instead of utilizing less expensive associates for such tasks as research and document review. Indeed, in January 2010, not a single

---

[9] This also begs the question as to what benefit it was to the estate to have twenty attorneys working for the Unsecured Creditors Committee.

McKool associate billed time to the estate, despite McKool requesting $141,730.68 in legal fees for January (*See* Docket No. 373-7). This practice led to the estate being charged more than was reasonable and necessary for the task.

27. Further, a review of McKool's billing records reveals numerous suspected billing errors or days of overbilling.[10] In other words, there are numerous examples of Hugh Ray, Jr. and Hugh Ray, III, both principals who charge more than $425 per hour, billing more than ten hours in a particular day. Specific examples are Hugh Ray, Jr. ($700/hour) billing the estate for 12.7 hours of work on December 18, 2009, Hugh Ray, III ($437.75/hour) billing the estate for 11 hours of work on December 18, 2009, Hugh Ray, III billing the estate for 12.3 hours of work on January 5, 2010, Hugh Ray, III billing the estate for 10 hours of work on January 6, 2010, Hugh Ray, III billing the estate for 12.5 hours of work on February 4, 2010, Hugh Ray, III billing the estate for 14.2 hours of work on March 2, 2010, including four hours of travel time billed at his full hourly rate, Hugh Ray, III billing the estate for 12.1 hours of work on June 1, 2010, Garrett Chambers ($465/hour) billing the estate for 11 hours of work on June 9, 2010, including 4 hours of travel time billed at his full hourly rate, and Holly Engelman ($450/hour) billing the estate for 11.7 hours of work on June 17, 2010. Of course, this does not count the over sixty dates in which McKool attorneys' billed the estate for over eight hours of work each.

3.  *Unclear billing*

28. A fee applicant's bills must be clear in order for a court to comply with its duties under § 330 to closely examine an application submitted for approval. In the instant case, many of McKool's time entries are improperly clumped or grouped and/or vague, which prevents a

---

[10] If the time represented was in fact properly recorded, the Court, from its own experience, can give consideration to the diminished value of the services provided by counsel during the course of a ten-plus hour billing period.

meaningful analysis by the Court. As described more fully below, the unclear time entries come in two varieties: (i) block or clumped billing, in which a professional would bill multiple tasks in one day without setting forth the amount of time spent on each task; and (ii) vague entries where the task performed, or the subject of the task, is unclear, redacted, or simply non-existent. In addition, compensation for these services must be reduced because McKool cannot demonstrate that these services provided a material benefit to the estate. *See Pro-Snax,* 157 F.3d at 426.

    a.  Improperly clumped or grouped time entries

    29.  The Complex Guidelines require professionals to segregate matters: "[i]f a number of separate tasks are performed on a single day, the fee application should disclose the time spent for each such task, i.e., no 'grouping' or 'clumping.'" Complex Guidelines, § IID. Here, a mere sampling of McKool's underlying invoices demonstrate that time entries were routinely clumped in violation of the Complex Guidelines. *See, e.g.*, Exhibit D.[11] In the foregoing examples, there is no way to distinguish how much time was spent on a particular task.

    b.  Vague time entries

    30.  The Complex Guidelines require a base level of detail for time entries. "At a minimum, the time entries should identify the person performing the service, the date(s) performed, what was done, and the subject involved. Mere notations of telephone call, conferences, research, drafting, etc., without identifying the matter involved, may result in disallowance of the time covered by the entries." Complex Guidelines § II.C; *see also In re Burival*, No. BK07-42271-TLS, Ch. 11, No. BK07-42273-TLS, Ch. 11, 2009 Bankr. LEXIS 2203, at *6 (Bankr. D. Neb. July 21, 2009) ("Vague fee applications that 'camouflage' the

---

[11] Hugh Ray Jr.'s block billed entries are but one example of McKool Smith's block billing violations. Overall, the block billing violations of Amy A. Nichols, Amanda A. Nugent, Ivan Wang, Hugh Ray Jr., Paul Williams, Nicholas Zugaro, Hector Nava, Hugh M. Ray III, Paul D. Moak, Mark. L. Mathie, Jennifer L. Truelove, and Holly E. Engelman total approximately $135,933.24. *See* Exhibit D.

amount of time spent on each task and hinder the court's scrutiny of the reasonableness of the time expended can lead to reduced fee awards.") (citing *In re Baker*, 374 B.R. 489, 495 (Bankr. E.D.N.Y. 2007)). Particularly egregious examples of McKool's vague entries are specifically stated in paragraph 6.

### *4  Inappropriate tasks or rates*

31.  The Applications contain numerous inappropriate requests, including (i) overhead costs, such as billing for filing and other clerical or administrative tasks; (ii) time spent on billing tasks that would be common to all clients; and (iii) non-work travel time at full rates.

1.  Overhead costs

32.  The Complex Guidelines prohibit the recovery of fees for administrative functions: "Time spent in addressing, stamping and stuffing envelopes, filing, photocopying or 'supervising' any of the foregoing is generally not compensable, whether performed by a professional, paraprofessional, or secretary." Complex Guidelines, II.H (emphasis added); *see also In re Bennett Funding Group, Inc.*, 213 B.R. 234, 248 (Bankr. N.D.N.Y. 1997) (reducing fee requests for purely clerical matters by 15%); *In re Fibermark, Inc.*, 349 B.R. 385, 400 (Bankr. D. Vt. 2006) (holding overhead expense will be "denied reimbursement categorically").

33.  Similarly, the Southern District Guidelines provide that professionals may not be compensated for services that are essentially clerical in nature absent 'very exceptional circumstances, such as emergency preparation for major trials or other exigent circumstances." Southern District Guidelines, § E. Moreover, even as to what purports to be an exigent circumstance, the Southern District Guidelines provide that "[m]ultiple claims in the same case may be considered as indicative of inadequate workflow planning and inadequate staffing, and thus not allowed." *Id*. By way of example Amy A. Nichols, Adrianna Wilcox, and Amanda E.

Nugent billed approximately $18,861 for the uploading of documents to Concordance in the Second Fee Application. *See* Exhibit B.

**B.     The Requested Compensation Should Be Reduced For Services That Failed To Provide A Material Benefit To The Estate.**

34.     In addition to the objections referenced above and below concerning inefficiencies and improper billing in violation of the Guidelines, the Applications should also be reduced because McKool has failed to establish that certain specific services rendered were necessary and/or provided a material benefit to the estate.

35.     Examples of such services that failed to provide a material benefit to the estate would include those listed in paragraph 6 (pp. 3-4) and footnote 8 (p. 11) above.

36.     Finally, in general, Respondents object to the sheer volume of fees being requested. Bankruptcy counsel and others have stated that the liquidation plan has gone quite well and that there have been no serious complications or delays. Yet McKool, so far, is seeking $1,292,576.33 in fees through July 9, 2010. Additionally, separate, sizeable fee applications have been filed by Bracewell & Giuliani, LLP, as counsel for the Debtors, and by Grant Thornton as financial advisor and John Bittner as CRO and Liquidating Trustee of the Debtor. That is all in addition to the employees of the Debtor who were also engaged in administration of the bankruptcy estate. As can be seen by the Fee Applications of those firms and various objections to those Applications, the fees sought by Bracewell & Giuliani, McKool and Grant Thornton total approximately $3.8 million only through July 9, 2010.

37.     Further, McKool is neither the CRO nor the Debtors' counsel, who have undoubtedly performed more work that benefitted the estate. Yet, McKool's exorbitant fee application exceeds the amount requested by Bracewell & Giuliani and Grant Thornton. In this light, in addition to the specific McKool fees and cost items addressed herein, McKool's fees –

in the absence of any assertion by McKool that the counsel for the Debtors failed to competently perform its role and thus required the Committee to counsel to fill the void, are exorbitant and should be reduced by a substantial percentage as clearly excessive.

### C.  McKool Violated The Guidelines For Expenses.

38.  McKool's Applications request reimbursement of a variety of expenses totaling over $49,423.74, of which more than $7,000 fails to comply with the Guidelines. Professionals must "furnish enough specificity for the Court to establish whether a given expense was both actual and necessary." *In re Korea Chosun Daily Times, Inc*., 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005) (quoting *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 834 (Bankr. D. Vt. 1987)). Expenses are "actual" if they are incurred and not based on a formula or *pro rata* calculation. *See In re Bennett Funding Group*, 213 B.R. at 244. Expenses are "necessary" if they were "required to accomplish the proper representation of the client." *In re Am. Preferred Prescription, Inc.*, 218 B.R. 680, 686-87 (Bankr. E.D.N.Y. 1998) (citing *In re Spanier Bros., Inc.*, 203 B.R. 85, 91 (Bankr. N.D. Ill. 1996)). While the Applications subdivide their underlying expenses into categories, it provides no detail to determine whether the expenses are otherwise compensable under § 330 or the Guidelines.

39.  A prime example of the expenses improperly billed to the Estate by McKool relate to the travel costs of McKool attorneys who office in Dallas to travel to Houston and vice versa. Not only was the Estate billed for transportation expenses of these attorneys, but it was also billed for their lodging, on-ground transportation, and meals.[12] In short, if McKool elected to staff the engagement in Houston with attorneys, particularly one of its lead attorneys, who resided outside of Houston, those expenses should be borne by McKool, and not by the bankruptcy estate.

---

[12] Again, many of these attorneys also billed the estate their full hourly rate during travel time.

- 18 -

WHEREFORE, PREMISES CONSIDERED, the Respondents respectfully pray that the Court reduce the amount of fees and expenses allowable in the Applications as herein requested, or as it may, in its discretion, adjust, and that they have such other and further relief to which they may be entitled.

Dated:  October 4, 2010

        THOMAS S. HENDERSON, Attorney At Law

By: *[signature: TS Henderson]*

        Thomas S. Henderson (TBA No. 09432300)

South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas 77002-2716
Telephone: (713) 227-9500
Facsimile:   (713) 620-3023

COUNSEL FOR THE RESPONDENTS

### **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading has been served on the parties listed on the attached Service List by ECF filing or first class mail on the 4th day of October, 2010.

*[signature: TS Henderson]*

Thomas S. Henderson